**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DUANE MORGAN** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **THE PRUDENTIAL INSURANCE** | : | **NO. 10-1000** |
| **COMPANY OF AMERICA** | : | |

## <u>MEMORANDUM OPINION</u>

**Savage, J.**                                                                            **November 18, 2010**

In this action brought pursuant to the Employee Retirement Income Security Act of 1964 ("ERISA"), Duane Morgan ("Morgan") challenges The Prudential Insurance Company of America's ("Prudential") denial of his claim for long term disability benefits. The factual issue is not whether Morgan is disabled, but what caused his disability. Morgan contends his disability is caused by fibromyalgia. Prudential argues the cause is anxiety and depression. The cause of Morgan's disability is critical because if it is a mental illness, his long term benefits are limited to 24 months.

After a thorough examination of the administrative record and applying a deferential standard of review, we find Prudential's determination that Morgan's disability was the result of anxiety and depression, a condition triggering the plan's 24-month mental illness limitation, is not supported by substantial evidence. Consequently, we conclude that Prudential acted arbitrarily and capriciously when it terminated Morgan's disability benefits. Therefore, judgment will be entered in favor of Morgan and against Prudential.

## Background

Morgan was employed by Prudential as a senior life representative. As part of his employment, he was covered under a long term disability plan ("Plan") governed by ERISA.

Morgan stopped working in September 2005 after complaining of chest pain, palpitations, dizziness, sweating, shaking, numbness in his arms, high blood pressure, difficulty sleeping, and diarrhea. Having determined that Morgan was suffering from a major depressive disorder - anxiety and hypertension, Prudential began paying him disability benefits on October 15, 2005. On March 28, 2006, his short term disability benefits were converted to long term benefits.

After paying long term disability benefits for two years, Prudential terminated Morgan's benefits. In its denial letter, Prudential advised Morgan that it determined that the cause of his disability was the "mental health diagnosis of depression and anxiety." Citing the Plan's mental illness limitation, which caps benefits for "mental illnesses" at 24 months, Prudential terminated his long term disability benefits as of March 28, 2008. Under the Plan, a "mental illness" is defined as "[a] psychiatric or psychological condition regardless of cause, including but not limited to . . . depression [and] . . . anxiety." Plan, Art. 7.7 (a)(8). A disability due to a mental illness is subject to a "limited pay period of 24 months." Plan, Art. 7.7 (a)(7)(B).

Morgan appealed Prudential's decision, claiming that his disability was due to fibromyalgia, not depression. In support of his appeal, he provided, among other things, a letter from his treating rheumatologist, Dr. Andrew Mermelstein, who confirmed the diagnosis of fibromyalgia.

Relying on a record review by Dr. Paul F. Howard, Prudential denied Morgan's appeal. Prudential concluded that Morgan's disability resulted from depression, not fibromyalgia.

The parties have filed cross-motions for summary judgment. Morgan claims that

Prudential's decision was arbitrary and capricious, and seeks reinstatement of his long term benefits. Prudential claims that its decision was supported by substantial evidence in the administrative record. It also asserts a cross claim against Morgan for reimbursement of overpayment of disability benefits.[1]

## ERISA Standard of Review

The denial of benefits under an ERISA qualified plan is reviewed using a deferential standard. Where the plan administrator has discretion to interpret the plan and to decide whether benefits are payable, the exercise of its fiduciary discretion is judged by an arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989). A court may not substitute its judgment for that of the administrator. *Vitale v. Latrobe Area Hosp.,* 420 F.3d 278, 286 (3d Cir. 2005) (quoting *Abnathya v. Hoffman-LaRoche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)). Accordingly, in deference to the plan administrator, the decision will not be reversed unless it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009).

Morgan initially requested that we apply the heightened standard of review used in *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377 (3d Cir. 2000). At oral argument, he acknowledged that the sliding-scale standard of review has been rejected by the Supreme Court. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). See *Doroshow*, 574 F.3d at 233-34; *Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009). A financial conflict arising from the administrator's dual role as evaluator and payor of

---

[1] Given our determination that Morgan is entitled to long term benefits, Prudential may deduct the overpayment from the past due benefits.

claims no longer may be used to raise the level of scrutiny. Nevertheless, it remains a factor to consider along with other factors in determining whether there has been an abuse of discretion. *Ellis v. Hartford Life and Accident Ins. Co.*, 594 F. Supp. 2d 564, 567 (E.D. Pa. 2009).

Where an employer funds its benefit plan through a trust with fixed contributions, there is no conflict of interest. *See Bluman v. Plan Adm'r and Trustees for CNA's Integrated Disability Program*, No. 08-0415, 2010 WL 2483884, at *5 (D. N.J. June 4, 2010) (citing *Smathers v. Multi-Tool, Inc./Multi-Platics, Inc. Emp. Health and Welfare Plan*, 298 F.3d 191, 198-99 (3d Cir. 2002)). On the other hand, a conflict of interest does arise where trust payments vary depending on the rate at which claims are approved. *Id.*

Here, the administrative committee, which is appointed and controlled by Prudential, has discretionary authority to interpret the terms of the Plan and to determine eligibility for benefits. The Plan is funded by the Prudential Welfare Benefits Trust ("Trust"). Trust assets may not be used for any purpose "other than for the exclusive benefit" of participants and for the cost of administering the Plan. Trust Agreement, Sec. 2. No part of the principal or income may revert to Prudential. *Id.*

The fact that the trust assets cannot be used for any purpose other than paying claims and administrative expenses is only one part of the equation. Prudential must fund the trust to maintain its solvency. If the payment of claims and expenses exceeds the contributions and the investment performance of the trust assets, Prudential must increase its contributions. In such circumstances, there could be an incentive to minimize the payment of claims.

During oral argument, Prudential's counsel confirmed that the Trust is funded by

Prudential on an "as needed basis." Because contributions to the Trust will vary depending on the number of claims paid, a financial conflict of interest is present. Therefore, we shall consider the conflict as one, but not significant, factor in determining whether there has been an abuse of discretion.

Procedural bias in the review process is another factor to examine. *Post v. Hartford Ins., Co.,* 501 F.3d 154, 164 (3d Cir. 2007). Procedural anomalies that call into question the fairness of the process and suggest arbitrariness include: relying on the opinions of non-treating over treating physicians without reason, *Kosiba v. Merck & Co.*, 384 F.3d 58, 67-68 (3d Cir. 2004); *Ricca v. Prudential Ins. Co. of Am.,* No. 08-257, 2010 WL 3855254 *7 (E.D. Pa. Sept. 30, 2010); failing to follow a plan's notification provisions, *Lemaire v. Hartford Life & Acc. Ins. Co.*, 69 F. App'x 88, 92-93 (3d Cir. 2003); conducting self-serving paper reviews of medical files, *Post*, 501 F.3d at 166; relying on favorable parts while discarding unfavorable parts in a medical report, *id.* at 165; denying benefits based on inadequate information and lax investigatory procedures, *Porter v. Broadspire*, 492 F. Supp. 2d 480, 485 (W.D. Pa. 2007); and, ignoring the recommendations of an insurance company's own employees, *Post*, 501 F.3d at 165.

### Evidence Available to Prudential

On September 28, 2006, Morgan's claim was initially evaluated by Prudential's medical director, Dr. Albert A. Kowalski,[2] who reviewed the records of Morgan's treating physicians. These records included: a May 20, 2006, mental status examination by Morgan's neuropsychiatrist, Dr. Miguel Aguilo-Seara, noting that Morgan had a major

---

[2] Dr. Kowalski is board certified in occupational medicine.

depression disorder; various mental status examinations conducted between 2005 and 2006 by Dr. Lisa Rooney confirming a major depression diagnosis; an attending physician statement, dated October 3, 2005, completed by Morgan's primary care physician, Dr. David Peet, listing anxiety as one obstacle to Morgan's returning to his position with Prudential; a letter from Morgan's neurologist, Dr. Tonya Stephenson, dated February 9, 2006, stating that she suspected Morgan's medical problems were related to depression and lack of sleep; and, a 2005 evaluation form and notes prepared by Morgan's psychologist, Bonnie Stewart, indicating that Morgan had an anxiety disorder. After reviewing Morgan's medical records, Dr. Kowalski opined that "the only primary reason" for Morgan's functional impairment is depression and anxiety.

On July 2, 2007, Dr. Kowalski undertook a reevaluation of Morgan's claim, considering updated medical records of Morgan's treating physicians. These included a neuropsychological evaluation by psychologist Steven Berk, dated September 16, 2006, which showed significant psychological deficits; records from the Neuropsychiatric Group noting that Morgan was being treated with Zoloft and Cymbalta; and, a December 4, 2006 letter from Dr. Lawrence Kerson, M.D., reporting that Morgan's neuromuscular complaints appeared real and his depression does not fully explain them.[3] Dr. Kowalski also reviewed records from Dr. Mermelstein, who, after examining Morgan on December 29, 2006, February 9, 2007, and March 23, 2007, diagnosed him with fibromyalgia.

After reviewing the new medical records, Dr. Kowalski noted, without citing any medical authority, that fibromyalgia rarely prevents a claimant from performing light or

---

[3] Dr. Kerson had Morgan undergo a muscle biopsy. The results were "mild to non-specific." Kerson Ltr. 12/22/06.

sedentary work. He opined that continuous impairment from fibromyalgia was "unlikely."

On March 11, 2008, after receiving updated medical records from Dr. Mermelstein, Dr. Kowalski undertook a third and final evaluation of Morgan's claim. He was provided Dr. Mermelstein's treatment notes, including those for May 24, 2007, September 27, 2007, and January 31, 2008, where Dr. Mermelstein stated that Morgan has some good days and bad days, but was receiving medication for his pain which has helped "a lot." Dr. Mermelstein also noted that his patient had 18 of 18 fibromyalgia tender points, but no muscle weakness.

At the conclusion of his review of Dr. Mermelstein's updated medical records, Dr. Kowalski opined that the records do not support a conclusion that Morgan is sufficiently impaired "from any physical condition" that would prevent him from performing light or sedentary work. At the same time, while acknowledging the severity of Morgan's symptoms, he framed the issue as whether he has a sustained and regular work capacity, "excluding his mental nervous condition." He wrote, "this question can not be answered with any degree of medical certainty with the information provided." Hence, Dr. Kowalski recommended three additional steps to determine if Morgan had any physical condition that would prevent him from engaging in sustained and regular work: (1) have Dr. Mermelstein complete a functional capacity questionnaire and identify any physical obstacles to his return to work; (2) consider an independent medical examination by a rheumatologist; and (3) surveillance.

On March 24, 2008, at Prudential's request, Dr. Mermelstein completed a functional capacity questionnaire. He verified that Morgan did not have the capacity for full or part time employment and could not estimate when he would be able to return to work. He

reported that Morgan could not stand or walk for more than five minutes at a time or sit for more than ten minutes at a time. He also reported, among other limitations, that Morgan could lift only up to 10 pounds occasionally, and never more than 20 pounds; and had limited ability to stoop, kneel, and reach overhead. The questionnaire did not inquire whether Morgan's restrictions were caused by fibromyalgia, depression, or both.

On May 5, 2008, Dr. Sheldon Solomon, a rheumatologist, examined Morgan at Prudential's request. He opined that Morgan had no functional abnormality caused by a musculoskeletal disease. He also concluded that Morgan's chronic pain is "not documented by any objective findings." Dr. Solomon cautioned that it was beyond his expertise to determine whether Morgan's disability was related to anxiety or depression.

In its May 22, 2008 denial letter, Prudential advised Morgan that Dr. Kowalski's record reviews and Dr. Solomon's physical examination indicated that his disability was the result of depression and anxiety. Thus, his claim was subject to the Plan's 24-month mental health limitation period which expired on March 28, 2008.

On August 12, 2008, Morgan appealed Prudential's decision. He argued that his disability was caused by fibromyalgia and not depression. He included three updated letters from his treating physicians. Drs. Mermelstein and Peet diagnosed Morgan's condition as fibromyalgia. Dr. Aguilo-Seara, Morgan's treating neuropsychiatrist, concluded that Morgan had "anxiety secondary to his fibromyalgia which prevents him from working."

Prudential then hired Dr. Howard, a board certified rheumatologist, to review Morgan's medical records. After reviewing Morgan's medical records, Dr. Howard agreed that Morgan had fibromyalgia, but concluded that he was not functionally impaired as a

result of the disorder. He based his conclusion "on the absence of motor weakness, loss of muscle strength and tone, abnormalities in station and gait . . . [or] any focal neurologic abnormalities." He also relied on Dr. Solomon's report to conclude that Morgan's underlying psychiatric disorder is the cause of his impairment. Thus, he concluded that Morgan has no work restrictions or limitations based on his fibromyalgia and can perform physical activities involving sitting, standing, walking, reaching, lifting, carrying, and fine motor hand skills.

Based on Dr. Howard's record review, Prudential denied Morgan's appeal. Although it did not dispute that Morgan had fibromyalgia, Prudential concluded that the condition did not cause his functional impairment. It attributed Morgan's impairment to anxiety and depression, and not to any physical restriction. Thus, according to Prudential, because Morgan's impairment is based on a mental condition, he was not entitled to long term disability benefits after March 28, 2008.

### Analysis

There is no question that Morgan has fibromyalgia and also suffers from anxiety and depression. The issue is whether there was substantial evidence from which Prudential could have reasonably concluded that Morgan's disability was caused by mental illness, in whole or part, and not fibromyalgia.

If Morgan's fibromyalgia and mental illness are independent of each other, the mental illness limitation applies. On the other hand, if the cause of Morgan's disability is fibromyalgia, which in turn caused his anxiety and depression, the limitation does not apply. A mental illness secondary to a physical condition is not the cause of the physical condition and the resulting disability. If but for the physical condition there would be no

mental illness, the latter cannot be considered a cause of an impairment. Even if the mental illness contributes to the impairment causing the disability, it is the physical condition, not the mental condition, that is the cause of the disability. Otherwise, whenever a claimant's physical disease or condition causes anxiety and depression, the mental illness limitation would always apply. Thus, we conclude that in a claim such as Morgan's, where a mental condition is a sequelae or component of a physical disease or condition, a mental illness limitation will not apply.

Prudential concluded that Morgan's mental illness was an independent cause of his disability, separate from his fibromyalgia. Therefore, we will consider the evidence that it relied upon in reaching this conclusion in order to determine if it acted arbitrarily.

In light of Prudential's reliance on the opinions of its staff physician and its hired consultants, we shall examine how it viewed their conclusions in comparison with those of Morgan's treating physicians. In doing so, we look to the bases of their respective conclusions, the extent of their analyses, the information available to them, and their treatment of that information.

If Prudential accorded undue deference to the opinions of consultants who never examined Morgan or gave them, without a sufficient basis, substantially more weight than the conclusions of Morgan's treating physicians, a procedural anomaly arises. *Kosiba*, 384 F.3d at 67-68. If their consultants' opinions are not founded on reliable evidence, they will not be given conclusive effect. *Addis v. Limited Long-Term Disability Program*, 425 F. Supp. 2d 610, 617 (E.D. Pa. 2006).

Although he is neither a psychiatrist nor a rheumatologist, Dr. Kowalski concluded that Morgan's anxiety and depression, not fibromyalgia, caused his impairment. In his final

record review, Dr. Kowalski admitted that he could not rule out fibromyalgia as a separate cause of Morgan's incapacity.  He only speculated that it was "*unlikely* that fibromyalgia alone would . . . prevent [him] from working," and suggested a medical examination be conducted by a rheumatologist. (emphasis added).

Interestingly, Dr. Kowalski had already determined that Morgan was disabled.  In his July 2, 2007 note, he wrote that the "medical records continue to suggest impairment from a psychiatric perspective."  He then concluded that "his prognosis for return to work is poor."

Dr. Solomon was the rheumatologist selected by Prudential to perform the examination.  His opinion is based on the fact that he could not find an "organic musculoskeletal disease" to explain Morgan's pain.  Fibromyalgia is not a disease; it is a syndrome. *See, e.g., Stackhouse v. Barnhart*, 435 F. Supp. 2d 28, 30 (D. D.C. 2006) (citations omitted).  According to the National Institute of Arthritis and Musculoskeletal and Skin Diseases at the National Institute of Health, a "syndrome is a collection of signs, symptoms, and medical problems that tend to occur together but are not related to a specific, identifiable cause.  A disease, on the other hand, has a specific cause or causes and recognizable signs and symptoms."[4] Dr. Solomon could not identify an organic disease causing Morgan's pain because fibromyalgia is not a disease and has no identifiable cause.  Thus, his analysis erroneously conflated Morgan's syndrome with a disease.

Similarly, Dr. Solomon's statement that Morgan's chronic pain is "not documented by any objective findings" does not support a conclusion that he does not have a disabling condition.  Fibromyalgia is a condition based on subjective complaints of pain.  *Steele v.*

---

[4] *See* "Questions and Answers about Fibromyalgia,"
http://www.niams.nih.gov/Health_Info/Fibromyalgia/default.asp (last visited November 10, 2010).

*Boeing Co.,* 225 F. App'x. 71, 74 -75 (3d Cir, 2007); *Kuhn v. The Prudential Ins. Co. of Am.*, 551 F. Supp. 2d 413, 428 (E.D. Pa. 2008). A fibromyalgia disability claim can not be denied on the basis of a lack of objective findings. *Steele,* 225 F. App'x. at 74 -75. Yet, that is what Prudential, using Dr. Solomon's report, did.

In his report to Prudential, Dr. Solomon discounted the basis for Morgan's treating rheumatologist's conclusion that his patient was disabled. He claimed that Dr. Mermelstein's opinion "was based on the patient's self reporting of severity of symptoms" alone and not objective findings. This statement is misleading because fibromyalgia defies diagnosis by objective findings. It also ignores that Dr. Mermelstein, in his reports, clearly stated that he found fibromyalgia tender points, 14 out of 18 on February 9, 2007, 18 out of 18 on March 23, 2007, and 14 out of 18 on May 29, 2008.

Although Prudential had Morgan examined by Dr. Solomon, its unequivocal reliance on his conclusions was not warranted. In the *Steele* case, the Third Circuit stated that requiring objective evidence of fibromyalgia would arbitrarily and capriciously eliminate all disability claims based on the disorder. *Steele,* 225 F. App'x. at 74 -75. Likewise, in *Kuhn* the district court warned Prudential that it could not require physical findings or objective evidence of fibromyalgia as a basis for disability. *Kuhn*, 551 F. Supp. 2d at 431. Nevertheless, having been previously warned that fibromyalgia is not an organic disease that can be diagnosed on the basis of objective findings, Prudential still adopted Dr. Solomon's conclusion that Morgan's chronic pain was not documented by any objective findings.

Dr. Solomon's findings, as far as they go, confirmed that Morgan has no objective signs. Relying on this fact alone is arbitrary. It reflects a bias to find any reason to deny the

claim.

Dr. Howard's finding that Morgan's mental condition is the cause of his incapacity is not credible. His opinion relied substantially on Dr. Solomon's findings. However, as described above, Dr. Solomon's findings were unreliable and misleading. In fact, Dr. Solomon himself had warned that he was not competent to determine whether Morgan's disability was caused by anxiety and depression. Thus, to the extent his opinion relied on Dr. Solomon's findings, it is questionable.

Among the records Dr. Howard reviewed and considered in reaching his opinions were Prudential's SOAP notes which he characterized as "a chronologic summary of the claimant's medical records and decision making concerning his disability," and Dr. Kowalski's file review. Howard was hired to render an independent opinion. Yet, rather than supplying him with only the medical records, Prudential provided him with documents that alerted him to what it had decided and why. Consequently, Howard was pointed in the direction where Prudential was heading. Indeed, Dr. Howard adopted the findings of Prudential's in-house doctor that Morgan's condition was psychiatric in nature and Dr. Solomon's suspicion that his condition had a "probable psychiatric cause."

Although he concludes that Morgan can complete all physical activities without restriction or limitation, Howard points to no evidence to support this conclusion. Nowhere in his report can one find a verifiable basis for this conclusion. He recites, but discounts, the medical history which is replete with medical causes. A close look at his opinion reveals that like Dr. Solomon, he excludes disability only on the lack of objective findings. He limits his opinion by saying that Morgan is not functionally impaired "on the absence of motor weakness, loss of muscle strength and tone, abnormalities in station and gait . . . [or] any

focal neurologic abnormalities." Even Drs. Kowalski and Solomon do not dispute that Morgan has a disabling impairment.

Dr. Howard did not physically examine Morgan. The absence of an examination is a factor in analyzing the differences in the opinions of the consultant and the treating physician. There is no obligation on the insurer to have an insured examined by a physician. However, where the insured's treating physician's disability opinion is unequivocal and based on a long term physician-patient relationship, reliance on a non-examining physician's opinion premised on a records review alone is suspect and suggests that the insurer is looking for a reason to deny benefits. *Kaufman v. Metro. Life Ins. Co.,* 658 F. Supp. 2d 643, 650 (E.D. Pa. 2009).

Giving the impression that Morgan's condition is mental, Dr. Howard cites Dr. Stephenson, saying "[s]he felt his problems related to depression and poor sleep" and that "[s]he felt his cognitive difficulties were related to severe depression." Howard ignores Dr. Stephenson's unequivocal statement in her response in August, 2006 to Prudential's questionnaire that "physical fatigue" is what is preventing Morgan from working. In her response to an earlier questionnaire in April, 2006, Dr. Stephenson had reported that "chronic fatigue, intolerance to activity, minor muscle weakness and memory difficulties" prevented Morgan from working. She further stated in her May 12, 2006 report that she suspected that his fatigue may be partially responsible for his depression. Dr. Howard either failed to consider or cast aside Dr. Stephenson's ultimate conclusion that it was "physical fatigue," not a mental illness, that prevented him from working.

Likewise, in summarizing Dr. Aguillo-Seara's findings, Dr. Howard selected only those portions of the documents that support a mental health finding. He notes that Dr.

Aguillo-Seara listed depression and muscle weakness as preventing Morgan from working. He mentions that the neuropsychiatrist had listed the diagnosis as major depression.

Dr. Howard failed to consider evidence that Morgan's mental illness is secondary to his fibromyalgia. Dr. Aguilo-Seara's letter dated June 19, 2008, states that Morgan has "increased anxiety secondary to his fibromyalgia which prevents him from working." Dr. Howard received this letter, but concluded that it is "unclear as to which diagnosis is preventing him from working ." He made no effort to contact Dr. Aguilo-Seara to clarify what he claims was unclear.

Dr. Howard apparently did not have all the records of Dr. Aquillo-Seara. In his report to Prudential, he lists the records as those dating from September 10, 2006 to June 7, 2007. Prudential did not provide Dr. Howard with the mental status examination that had been performed on May 20, 2006. That document reported that Morgan suffered from "multiple medical problems." Although Dr. Aquillo-Seara diagnosed Morgan with major depression, he never opined that the condition caused his disability. Either Dr. Howard was not provided with the May 20, 2006 report or he ignored it. In either event, critical information that was favorable to Morgan was not factored into the analysis.

Commenting on Dr. Mermelstein's conclusion, as stated in the Functional Capacity Questionnaire, that Morgan was not capable of working full or part time, Dr. Howard questioned the validity of that conclusion because it "was based on the patient's self-reported symptoms and not based on [Mermelstein's] observations or objective findings." Again, Dr. Howard inappropriately focuses on the absence of objective findings. Also, his conclusion that Dr. Mermelstein's opinions were not based on his observations is a misstatement. Dr. Mermelstein was a treating physician who saw his patient over time and

examined him on multiple occasions.

The record before Dr. Howard and Prudential demonstrates that Dr. Mermelstein's opinions are based on his findings and personal observations. Indeed, he treated and examined Morgan beginning in December, 2006. In his report of June 20, 2008, Dr. Mermelstein noted that Morgan had "undergone a thorough medical work-up to exclude other cause of his pain and his work-up has been negative." Dr. Peet also relied on "[c]linical and laboratory testing by Dr. Mermelstein." R. 60.

Dr. Howard selects only those medical sources that support his opinion. In diagnosing Morgan with fibromyalgia, Dr. Howard cites the American College of Rheumatology's ("ACR") diagnostic criteria. However, in concluding that Morgan's mental illness is the independent cause of his disability, he ignores the ACR's definition of fibromyalgia which lists depression and anxiety as symptoms.[5]

Prudential relied on Dr. Howard's record review in determining that Morgan was subject to the Plan's mental health limitation. In his report, Dr. Howard acknowledged that Morgan had fibromyalgia, but denied that it was debilitating or caused physical restrictions. However, he dismissed Dr. Mermelstein's functional capacity questionnaire indicating that Morgan had no work capacity on the impermissible ground that there were no objective findings. He opined that there was "no evidence of functional impairment associated with fibromyalgia based on the absence" of objective findings. He also ignored Dr. Stephenson's finding that "chronic fatigue and intolerance to activity" were preventing Morgan from working. Drs. Mermelstein and Stephenson have been treating Morgan since December

---

[5]*See "What is Fibromyalgia,"*
http://www.rheumatology.org/practice/clinical/patients/diseases_and_conditions/fibromyalgia.asp (visited November 18, 2010).

9, 2006, and February 9, 2006, respectively. Dr. Howard made no attempt to reconcile his conclusion with the contradictory findings of Morgan's long-time physicians. Nor did Prudential.

Dr. Howard's conclusion is founded on the opinions of Prudential's consultant and its medical director, and ignores the contrary findings of Morgan's treating physicians. It also ignores the medical definition of fibromyalgia which undermines his conclusions. Prudential's acceptance of Dr. Howard's findings, without explaining why it accepted them over Morgan's treating doctors, suggests that it was searching for a reason to deny Morgan's benefits.

Based on the evidence in the record, Prudential's decision to credit the unqualified conjecture of Dr. Kowalski, the unreliable opinion of Dr. Solomon, and the groundless findings of Dr. Howard over Drs. Mermelstein and Stephenson was not reasonable. Although we do not automatically defer to treating physicians, Prudential's decision strongly suggests a procedural bias. It did not explain why it chose to ignore the credible findings of Drs. Mermelstein and Stephenson, except to rely on the absence of objective findings. Prudential's selectivity in what medical evidence it accepted and what it rejected or ignored casts doubt on the fairness of the decision making process.

Early in the claims process, Prudential's in-house doctor recognized that depression is commonly associated with fibromyalgia and increases the impairment resulting from fibromyalgia. He suggested that a psychiatrist be consulted. Nevertheless, despite his recommendation, Prudential did not have a psychiatrist review the medical records and examine Morgan to determine the cause of his depression and anxiety. On March 11, 2008, Dr. Kowalski wrote to the file that "[t]he primary issue is, from a physical perspective,

does the claimant have sustained and regular work capacity, excluding his mental nervous condition? Based on the chronicity of the claimant's illness and the lack of medical records, this question can not be answered with any degree of medical certainty with the information provided. Additional steps are appropriate." Yet, Prudential never consulted a psychiatrist or obtained a psychiatric evaluation.

Prudential has been warned that it cannot reject fibromyalgia claims for lack of objective evidence. *See, e.g., Steele v. Boeing Co.,* 225 F. App'x at 74*; Kuhn v. The Prudential Insurance Company of America*, 551 F. Supp. 2d at 428. Faced with this restriction, it now seeks to avoid paying these claims by isolating symptoms of fibromyalgia - anxiety and depression[6] - and characterizing those symptoms as the disabling condition. By segregating symptoms from the disease, Prudential is choosing those that fit into a category that limits benefits.

Although Morgan may suffer from anxiety and depression, the cause of those symptoms, and, thus, the cause of the disability is fibromyalgia. Because his mental condition is merely a sequelae or component of the disorder, the mental illness limitation does not apply.

Prudential contends that Morgan simultaneously received disability benefits under the Plan and Social Security disability benefits between March 1, 2006 and March 27, 2008. Accordingly, because the Plan failed to offset Social Security benefits as it can under the

---

[6] Symptoms of fibromyalgia include depression and anxiety. *See "What is Fibromyalgia,"* http://www.rheumatology.org/practice/clinical/patients/diseases_and_conditions/fibromyalgia.asp (visited November 18, 2010)

Plan, Morgan was overpaid $3,667.11[7] in short and long term benefits.

There is no dispute that both short term and long term benefits are offset by Social Security benefits. Plan, Art. 7.7 (i). Beneficiaries must reimburse the Plan for any overpayment that arises from a retroactive award of Social Security benefits. *Id.* In addition, Morgan executed a Reimbursement Agreement on April 22, 2006, in which he agreed to reimburse the Plan for any retroactive Social Security benefits paid.

Morgan does not dispute the simultaneous receipt of Social Security benefits and short term benefits from March 1, 2006 through March 27, 2006. He argues that he is not responsible for reimbursing Prudential because Prudential advised him in a letter that he would be responsible for reimbursing the Plan for overpayments in long term disability benefits only. The letter is not a contract and contains no language restricting Prudential's ability to be reimbursed for short term benefits. Moreover, the terms of the Plan and the Reimbursement Agreement both confirm Morgan's obligation to reimburse the Plan for overpayment in short term reimbursements.

With respect to long term benefits, Prudential contends that because Morgan received both Social Security benefits and long term benefits from March 28, 2006 through March 27, 2008, he was required to reimburse it for 24 months in overpayments, but only reimbursed it for 23 months. Morgan argues that he only received 23 months of long term benefits, and that there is nothing in the administrative record proving otherwise. However, he contradicted his own argument by admitting that he received 24 months of long term benefits in his response to Prudential's Statement of Undisputed Facts. *Pl. Resp. to Def.*

---

[7] This figure includes overpayment of $2,494.85 in short term benefits, and $1,172.26 in long term benefits.

*Facts*, ¶ 68.

Based on the record and Morgan's own admission, we conclude that he was overpaid a total of $3,667.11 in short term and long term benefits. Therefore, Prudential is entitled to reimbursement of the overpayment.

### Conclusion

Considering the administrative record and applying a deferential standard of review, we find that Prudential's decision to deny Morgan long term benefits is not supported by substantial evidence. Instead, it was arbitrary and capricious. Therefore, Morgan's motion for summary judgment will be granted and Prudential's motion for summary judgment will be denied.[8]

---

[8] With respect to Prudential's counter claim, we find that Morgan was overpaid $3,667.11 in short term and long term disability benefits. Prudential may deduct that amount from past due benefits.